UNITED STATES of America, Plaintiff-Appellee,

v.

Daniel Newton FLICKINGER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

John H. MUNIER, Jr., Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Robert William McLAUGHLIN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Stanley David HAYDUK, Defendant-Appellant.

Nos. 76–2656, 76–2989, 76–3483 and 76–2655.

United States Court of Appeals, Ninth Circuit.

March 24, 1978.

Rehearing and Rehearing En Banc in No. 76–2656 is Denied May 25, 1978.

Robert N. Peccole, Las Vegas, Nev., for Hayduk.

Oscar B. Goodman, Las Vegas, Nev., for Flickinger.

Jeffrey D. Sobel, Las Vegas, Nev., for Munier.

Albert G. Freeman, Jr. (appeared), Tucson, Ariz., for McLaughlin.

Philip M. Pro, Asst. U. S. Atty. (appeared), Las Vegas, Nev., for plaintiff-appellee.

Before KOELSCH, DUNIWAY and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

Flickinger, Munier, McLaughlin and Hayduk were each convicted following a non-jury trial of conspiracy to import a controlled substance and to possess a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 846, 952 and 963; importation of a controlled substance in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2; and possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On appeal, they raise several contentions concerning the admission of evidence at trial. They also challenge the validity of the indictment under which they were charged. We affirm.

I.

In late June 1975, agents of the Drug Enforcement Administration (DEA) began a surveillance of Flickinger and his Chevro-

let Suburban. The surveillance was soon broadened to include three additional individuals, Munier, McLaughlin, and Hayduk, and two additional vehicles, another Chevrolet Suburban (the second Suburban) and a white pickup truck fitted with a camper top.

On July 11 and 12, DEA agents observed a series of events pertaining to the two Suburbans and the pickup. On July 11, Flickinger, Munier, and McLaughlin were seen taking the second Suburban to a tire store in Las Vegas where it was fitted with wide desert-type tires. Later that same day, Munier was seen at another tire store in Las Vegas with Flickinger's Suburban. That vehicle was also fitted with desert-type tires. Also on the 11th, McLaughlin was seen working on the pickup in front of Flickinger's Las Vegas home, apparently installing an aerial.

On the 12th McLaughlin and Hayduk were observed taking the pickup to various businesses in Las Vegas. At one location, a lumber store, they were observed installing plywood in the bed of the pickup. Later that day, DEA agents saw McLaughlin and Hayduk painting the doors of the pickup.

The next significant event occurred on July 16, when Flickinger and Munier were observed in Flickinger's Suburban traveling from his home to McCarran Airport in Las Vegas. At the airport, they parked next to Flickinger's Piper Navajo aircraft and transferred boxes from the vehicle to the plane and from the plane to the vehicle. Subsequently, Munier drove away and Flickinger entered the plane and took off.

Later in the day, Flickinger was observed at the Tucson, Arizona, airport. Susan Caron, a sales person at the airport, saw Flickinger pay for gasoline for his aircraft and purchase aeronautical maps for Mexico. Caron also noted that at the time of the purchases, Flickinger was accompanied by a man of Mexican appearance. Through a DEA agent who interviewed Caron, the information concerning Flickinger's stay in Tucson was relayed to agents in Las Vegas.

Still later on the same day, DEA agents followed the pickup occupied by McLaughlin and Hayduk from Las Vegas to a dry lake bed in eastern California known as Hidden Hills Dry Lake. Approximately the same time, other agents in separate vehicles followed Flickinger's Suburban as it was driven by Munier from Las Vegas to Hidden Hills Dry Lake.

That evening DEA agents, who had taken up positions at various locations around the lake for purposes of surveillance, were joined by Larry Guy, an agent with the Federal Communications Commission (FCC), who entered the case at the request of a DEA agent to determine if there might be any violations of the federal communications laws. Guy brought radio equipment designed for interception and location of radio transmissions.

There was no activity at Hidden Hills Dry Lake until approximately noon on July 17, when Munier was seen in Flickinger's Suburban driving up to a public phone in the area. Soon after Munier left the phone booth, Guy intercepted a radio transmission which included the following language:

"Ah, it looks like it's on for tonight. He called Susan last night."

Flickinger's wife's name is Susan. Through the use of his equipment, Guy was able to determine that the transmission signal came from Flickinger's Suburban parked next to the public phone.

Approximately 8:00 p.m., McLaughlin and Hayduk, who had previously left the lake bed for a small town in the area, returned to the lake. Munier arrived at the lake approximately the same time. Nothing eventful occurred until 11:00 p.m. when Guy began to pick up radio transmissions. Between the hours of 11:00 p.m. on July 17 and 1:00 a.m. on July 18, Guy intercepted a series of transmissions between Flickinger's Suburban, which had transmitted earlier in the day, and a second vehicle on the lake bed. Included in the transmissions were certain critical statements. At one point, the voice which Guy had heard earlier in the day stated:

"Ah, I didn't get that, Dan was talking."

At another point, a second voice stated:

"Dan told us to try to cover up his tracks and in the process we wound up

getting lost; we lost his tracks and a just can't tell nothing out here . . .."
Flickinger's first name is Daniel. Approximately 11:00 p. m., one of the DEA agents who was conducting surveillance of the area believed that he heard an airplane.

Approximately 1:00 a. m., Flickinger's Suburban and the pickup left the area in different directions. The agents then met and listened to the tape recordings which Guy had made of the radio transmissions. From the tapes, the agents determined that an airplane drop had been made. Agent Bowe, who was at the lake bed, called Agent Jezzeny at McCarran Airport in Las Vegas. Jezzeny reported that just prior to receiving this call, he observed Flickinger land his plane. Based on information from the tapes, the statement from Agent Jezzeny, and the information derived from the earlier surveillance, Agent Bowe called California and Nevada authorities, requesting them to stop and seize the vehicles. The DEA agents then left in pursuit of the vehicles.

The pickup was stopped and McLaughlin and Hayduk were apprehended by officers of the Nye County, Nevada, sheriff's department approximately 4:03 a. m. on July 18. The vehicle was taken to the sheriff's office in Tonopah, Nevada, where it was searched and found to contain 31 sacks of marijuana. McLaughlin and Hayduk were then arrested.

After Flickinger left McCarran Airport, Agent Jezzeny attempted to locate him and about 2:45 a. m. observed Flickinger's Suburban parked in front of Flickinger's home. Jezzeny then went to the DEA office in Las Vegas.

About 5:30 a. m., Agent Jezzeny returned to Flickinger's where he met a second agent. At that time, because of a phone call from another agent, both agents knew that McLaughlin and Hayduk were in custody and that the marijuana had been found in the pickup. The two agents placed Flickinger's home under surveillance until two more agents arrived approximately 6:30 a. m. The agents then knocked on the front door, announced that they were from Western Union, then announced that they were from the DEA. Subsequently, they entered the house and arrested Flickinger, Munier, and Susan Flickinger. After being placed under arrest, Flickinger made several statements to the arresting agents, all directly resulting from the arrest and all incriminating. At the time of the arrests, the agents did not have an arrest warrant nor was there any attempt to obtain an arrest warrant prior to the entering of the house.

Subsequent to the arrests, DEA agents searched the aircraft flown by Flickinger. Three days later, the aircraft was searched a second time. Incriminating evidence was found during these searches.

Other important evidence was developed by FCC Agent Guy. On the day of the arrests, Guy interviewed Flickinger and Munier in the Clark County Jail in Las Vegas regarding possible violations of FCC regulations. Several days later, Guy again went to the Clark County Jail, this time to interview McLaughlin and Hayduk, who had been transferred there after their initial arrest at Tonopah. During the course of these two interviews, Guy recognized the voice of Munier as the first voice and that of McLaughlin as the second voice which he had heard during the radio transmission surveillance at Hidden Hills Dry Lake.

Flickinger, Munier, McLaughlin, and Hayduk were first charged by complaint dated July 18, 1975, with possession of a controlled substance with intent to distribute. The complaint was filed in the United States District Court for the District of Nevada. Subsequently, the four defendants were indicted and charged with conspiracy to import a controlled substance and importation in the United States District Court for the Eastern District of California. A change of venue motion was granted and the case was transferred back to Nevada. Thereafter, the four were charged with the three-count indictment on which their present convictions are based. The two-count indictment was dismissed and the case was tried to the district judge sitting without a jury, resulting in guilty judgments on all three counts.

## II.

All four urge that the warrantless arrests of Flickinger and Munier were violative of the Fourth Amendment. Accordingly, it is contended, the statements elicited from Flickinger at the time of his arrest were erroneously admitted into evidence. Because of our disposition of this issue, it is unnecessary for us to determine whether any of the four, other than Flickinger, has standing to complain.

In order to arrive at the conclusion that Flickinger's statements were properly admitted into evidence, we must analyze whether the entry and arrest were valid. Flickinger admits that there was probable cause · to effect the arrest. We agree. However, this does not resolve the problem. Although the Supreme Court has held that a warrantless felony arrest in a public place is valid based solely upon probable cause, *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), neither the Supreme Court, *id.* at 432–33, 96 S.Ct. 820 (Powell, J., concurring; Stewart, J., concurring); *United States v. Santana*, 427 U.S. 38, 45, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (Marshall, J., dissenting), nor our circuit, *United States v. McLaughlin*, 525 F.2d 517, 520 (9th Cir. 1975), have reached the issue whether probable cause to arrest is sufficient by itself to justify a warrantless entry into a private place, particularly a private residence, in order to effect a warrantless arrest. In several cases, this issue was not reached because the facts indicated that there were exigent circumstances which justified the failure to obtain an arrest warrant. *United States v. McLaughlin, supra*, 525 F.2d 517; *United States v. Curran*, 498 F.2d 30 (9th Cir. 1974); *United States v. Bustamante-Gamez*, 488 F.2d 4 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). We should therefore first determine whether there were any such exigent circumstances.

Ordinarily, exigency does not evolve from one single fact. Indeed, we are often confronted with a mosaic—no one part of which is itself sufficient. Our task is to review the totality of the circumstances to determine if the finding of exigency was proper.

First, the government argues that there was a risk of destruction of evidence in this case which demanded immediate action and justified the failure to obtain .a warrant. Specifically, it is argued that because Flickinger was seen by Agent Jezzeny carrying a briefcase from the plane following his landing at McCarran Airport, the DEA agents could reasonably believe that he had brought evidence into his home. The government also seems to argue that because Flickinger's Suburban, which had been seen at Hidden Hills Dry Lake, was parked in front of Flickinger's home, there was a likelihood that evidence had been brought into the house from the Suburban. Both events, the government contends, indicate that the DEA agents could have reasonably determined that the evidence might be destroyed if they delayed in arresting the occupants of the house.

Admittedly, the observation of Flickinger carrying a briefcase is insufficient alone to demonstrate exigency. A standard for exigent circumstances which permitted avoidance of the warrant requirement on such a low level of probability would completely obviate the need for a warrant at any time, for in every case where an individual is suspected of participating in a crime there is a possibility that he might have taken evidence of some kind with him upon leaving the scene of the crime.

The more significant observation was of Flickinger's Suburban parked in front of the house. Based on the earlier surveillance, the substance of the citizen band radio conversation, and the timing of the departure of the vehicles at Hidden Hills Dry Lake as compared with Flickinger's landing at McCarran Airport, the DEA agents could reasonably believe that the two vehicles leaving the lake bed contained contraband. Therefore, upon viewing one of those vehicles in front of Flickinger's home, the agents could reasonably believe that there was evidence on the premises. The critical question is whether that evidence was in imminent danger of being

destroyed. It is true that from 5:30 a. m., when surveillance began, until 6:30 a. m., when the agents knocked on the door, there was no sign that anyone was awake in the house. Apart from the possibility of a warning telephone call, the agents had no specific reason to believe that the occupants were on notice of their danger and were likely to destroy evidence absent immediate arrest.

■ A second type of exigency urged by the government involves risk of danger to the arresting officers or to third persons. Where the crime on which the arrest is based is a crime of violence or the suspect is reasonably believed to be armed, the increased danger to the community and to the arresting officers justifies the avoidance of delay involved in obtaining a warrant. *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). However, marijuana smuggling is not necessarily a crime of violence and there was no evidence of violence in this case. In addition, there was no indication that any of the people in the house were in possession of weapons.

We are not unsympathetic with the government's premise that "anytime agents seek to effect an arrest or search of a residence, with or without a warrant, the possibility that persons inside might have access to weapons is very real and sometimes critical." Followed to its logical conclusion, however, the government's contention would obviate the necessity for a warrant in any arrest in a residence because every such arrest would involve the potential use of weapons. While we are critically mindful of the need for protection of arresting officers, we cannot accept the full thrust of the government's argument.

■ The term "exigent circumstances," in conjunction with an arrest in a residence, refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action. Such is the case where police know or reasonably believe that a suspect is armed, for quick action increases the likelihood that the suspect may be disarmed without injuring others. On the other hand, when the police do not have a reasonable basis for believing the suspect is armed beyond his alleged participation in non-violent criminal activity, that fact alone is insufficient to demonstrate exigency.

■ The government also argues that there was a risk that the occupants of the house could escape absent immediate action which justified the warrantless entry. Where there is such a danger, the police may act immediately to effect a warrantless arrest. *United States v. McLaughlin, supra*, 525 F.2d at 521; *United States v. Bustamante-Gamez, supra*, 488 F.2d at 8–9. In this case, however, this argument alone is insufficient. Throughout the continuous, one hour early-morning surveillance of the house prior to the entry and arrest, there was no sign that any of the occupants were awake.

The government's final argument is that because McLaughlin and Hayduk had been arrested approximately two and one-half hours earlier, there was a danger that Flickinger and Munier might be advised of the arrests and of their own danger. In some cases we have treated the suspect's knowledge that he is at risk of immediate apprehension as an exigent circumstance justifying immediate action. *United States v. McLaughlin, supra*, 525 F.2d at 521; *United States v. Curran, supra*, 498 F.2d at 35–36; *United States v. Bustamante-Gamez, supra*, 488 F.2d at 8–9. This is appropriate, for such knowledge substantially aggravates each of the exigencies already discussed. A suspect who realizes that he is in danger of immediate apprehension is clearly more likely to destroy evidence, to attempt an escape, or to engage in armed resistance than is a suspect who is taken unawares. By acting promptly, however, the police can substantially mitigate the possibility of such occurrences.

The alternative to immediate action may be that the police would take escalated precautionary measures while awaiting the warrant in order to guarantee that the suspect could not escape and to assure their own safety. This may include cordoning

off the residence. Such measures, while appropriate in some cases, may carry their own unacceptable dangers, *i. e.*, a heightened risk of weapons play and danger to third parties. *Compare United States v. McLaughlin, supra*, 525 F.2d at 521 *with United States v. Calhoun*, 542 F.2d 1094, 1102 (9th Cir. 1976); *United States v. Bustamante-Gamez, supra*, 488 F.2d at 9.

Accordingly, this consideration is a critical part of the case. It would not be unreasonable for the DEA officers to fear that a warning telephone call would come to the Flickinger home from McLaughlin and Hayduk or from someone they would contact. In addition, the agents could reasonably believe that some or all of the large quantity of marijuana was to be delivered to additional unknown confederates. Not knowing when the marijuana was due at its next destination, the agents could reasonably conclude that a concerned prospective recipient might alert Flickinger that the delivery was overdue and thus had possibly been intercepted.[1] Moreover, such an alerting telephone call would, of course, activate the standard exigencies discussed above: escape, destruction of evidence, and danger of violence. *See United States v. Evans*, 481 F.2d 990, 993 (9th Cir. 1973).

Reviewing the totality of all the circumstances leads us to conclude that there is a close question as to exigency. The district judge, after hearing the evidence and oral argument, thought the question deserved his study of a written transcript and special briefs. It was only after reviewing this material that the district judge concluded that there were exigencies sufficient to justify an arrest without a warrant.

We turn first to the question of what standard of review is applicable to this issue. While no case from our circuit has been called to our attention deciding the precise question, we have decided analogous issues. For example, in *United States v. Hart*, 546 F.2d 798, 801–02 (9th Cir. 1976) (en banc), *cert. denied, sub nom. Robles v. United States*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 571 (1977), we concluded that the determination that police officers had done everything "reasonably necessary and proper" to make a witness available was factual in nature and our review was by the clearly erroneous standard.

In *United States v. Page*, 302 F.2d 81, 85 (9th Cir. 1962), we held similarly that whether consent was "freely and intelligently given" and that there was "no duress or coercion, express or implied" was a factual issue to be tested by the clearly erroneous standard. *See also, United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977), and *United States v. Tolias*, 548 F.2d 277, 278 (9th Cir. 1977).[2]

■ Our experience dictates that the question of exigent circumstances is fundamentally the same type of issue as the questions of voluntariness of a consent and whether officers had done everything reasonably necessary to produce a witness. Certainly, a finding of exigent circumstances is no less based on the "fact-finding tribunal's experience with the mainsprings of human conduct." *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218

---

1. That such a telephone call could reasonably be expected is amply demonstrated by the district judge's finding that Flickinger's home was "the smuggling headquarters."

2. We have recently indicated that the proper standard of review for the question of probable cause *may* also be clearly erroneous. *See United States v. Thompson*, 558 F.2d 522, 524–25 (9th Cir. 1977); *United States v. Patterson*, 492 F.2d 995, 996 (9th Cir.), *cert. denied*, 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974); *Costello v. United States*, 324 F.2d 260, 261 (9th Cir. 1963), *cert. denied*, 376 U.S. 930, 84 S.Ct. 699, 11 L.Ed.2d 650 (1964). If we have so held, we

would be even more persuaded that the finding of exigent circumstances should be tested by the clearly erroneous standard. However, it is not free from doubt that a finding of probable cause is to be so tested. *See United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106, 1108 (9th Cir. 1976). In any event, we deem the issue of exigent circumstances to be more closely related to the mixed fact-law question involved in *United States v. Hart, supra*, 546 F.2d 798, than the ultimate constitutional standard of probable cause. *See Ker v. California*, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

(1960); *see Lundgren v. Freeman*, 307 F.2d 104, 115 (9th Cir. 1962); *United States v. Hart, supra*, 546 F.2d at 802. Accordingly, we hold that the proper standard of review of a finding regarding exigent circumstances is whether the finding was clearly erroneous.[3]

Guidance for the application of the clearly erroneous test was amply given by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969):

> In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ Applying this test to the case before us, we cannot say we are left with a "definite and firm conviction that a mistake has been committed." Although the issue is close and segmenting the various circumstances may show weakness in some, the factors taken as a whole are sufficient to meet the appellate test. Therefore, we conclude that the admitted probable cause plus the exigent circumstances validate the warrantless arrest and we, therefore, need not address the question of whether a warrantless arrest in a home based only upon probable cause is valid.

### III.

■ McLaughlin argues that the warrantless seizures and searches of the pickup and Flickinger's aircraft were violative of his Fourth Amendment rights. Accordingly, it is contended, all resulting evidence should be suppressed. Pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, Flickinger, Munier and Hayduk adopt McLaughlin's argument.[4]

Probable cause for the searches and seizures is not challenged. We hold that they were clearly valid under the "moving vehicle" exception to the normal warrant requirement. Under this exception, a vehicle may be stopped and searched solely on probable cause. *Carroll v. U. S.*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 458–64, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney*, 399 U.S. 42, 46–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The need for a search warrant is excused by the exigent circumstances that the vehicle is "movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." *Chambers v. Maroney, supra*, 399 U.S. at 51, 90 S.Ct. at 1981.

### IV.

■ Flickinger, McLaughlin and Hayduk adopt Munier's argument that the court erred in admitting the testimony of FCC Agent Guy, who stated that the voices in the taped CB conversations were those of Munier and McLaughlin. They contend that the testimony should have been suppressed because of the impermissibly suggestive way in which the identification was made. In particular they point out that the

---

3. The District of Columbia circuit has apparently also held that the appropriate test is whether the finding is clearly erroneous. *See United States v. Bradshaw*, 169 U.S.App.D.C. 129, 515 F.2d 360, 365 (1975); *but cf. United States v. Gargotto*, 510 F.2d 409, 411 (6th Cir. 1974).

4. It is unnecessary to complicate our disposition by ferreting out the obvious standing problems. Suffice it to say that at least one defendant has standing to complain pertaining to each search.

identification was made without a line-up and that Guy seemed to know their names prior to the identification.

In *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court considered the scope of due process protection against admission of evidence derived from pretrial identification procedures. The Court held that such evidence was not admissible where "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Id.* at 301–02, 87 S.Ct. at 1972. In making this determination, it is necessary to examine the "totality of the circumstances." *Id.* at 302, 87 S.Ct. 1967. Although this test was enunciated with regard to a visual identification, it is equally applicable to a voice identification.

Here, we find that the procedures used by Guy were unnecessarily suggestive. Instead of a face-to-face interview, which obviously focuses on one person, a line-up could have been arranged, thereby minimizing the attention directed to one individual. However, there is no per se rule of exclusion for unnecessarily suggestive identification procedures. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *Stovall* suggests a two-part test concerning exclusion of identification testimony by requiring that the procedure be "unnecessarily suggestive *and* conducive to irreparable mistaken identification . . . ." *Stovall v. Denno, supra*, 388 U.S. at 302, 87 S.Ct. at 1972 (emphasis added). Interpreting this test, the Court has held that the primary issue is the reliability of the identification evidence within the totality of the circumstances. *Manson v. Brathwaite, supra*, 432 U.S. at 111, 97 S.Ct. 2243.

Here, several factors indicate that the suggestive elements of the identification procedure did not play a role in the actual determination of identity made by Guy. These same factors support the credibility of Guy's determination. First, Guy made it clear that his identification of Munier and McLaughlin was based solely on his own comparison of the two voices he heard and recorded during the CB radio transmission at the lake bed, and the live voices of Munier and McLaughlin. Because of the danger that circumstantial evidence might have focused Guy's suspicion on the jailed suspects, the district judge questioned him carefully on this point.

Second, Guy was experienced in voice identification. He testified that he had had occasion to perform approximately 100 similar voice identifications during the preceding 15 years and that in ten of the cases, he had been called upon to testify in federal court. This experience would ordinarily lead Guy to make the identifications in a careful professional manner, based on the information which was properly before him.

Finally, the original specimen of the voices was on a tape recording. Thus, the specimen was subject to repetition, assuring that Guy was familiar with it when he heard the live voices of the suspects. All of these factors support a conclusion that while there were suggestive elements surrounding the identification, these elements did not affect the actual determination of identity made by Guy. Reviewing the totality of the circumstances, we find that the district judge did not err in concluding that Guy's testimony was admissible.

The case cited for the proposition that the procedures at issue here violated due process is readily distinguishable. In *Palmer v. Peyton*, 359 F.2d 199 (4th Cir. 1966), a rape victim was brought to the police station to listen to the voice of a suspect. Such a procedure is intensely suggestive for, in essence, the police are stating to the victim of a violent crime that the individual under examination was the perpetrator. Because of the aura of professionalism surrounding police officers and the victim's own desire to find the perpetrator, the victim will be under emotional pressure to concur with the judgment of the police. By contrast, the experienced expert witness who is not personally involved in the crime is less likely to be swayed by the judgment of the police. In addition, the expert is aware of his duty to prevent circumstantial evidence from af-

fecting his judgment and may be expected to act in accord with this responsibility.[5]

## V.

McLaughlin and Hayduk contend that the evidence introduced at trial was not sufficient to support their convictions on the three counts contained in the indictment. Flickinger and Munier join in their arguments.

Taking first the importation count, count 2, the government was required to prove that on or about July 18, 1975, the defendants knowingly and intentionally did import marijuana, a controlled substance, into the United States from Mexico. 21 U.S.C. § 952(a). Here, of course, McLaughlin, Munier and Hayduk were not the parties who were alleged to have actually brought the marijuana in from Mexico. They could still be convicted, however, if the government proved that they aided or abetted in the crime. *Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949); 18 U.S.C. § 2. To prove aiding and abetting, the government was required to demonstrate that McLaughlin, Munier and Hayduk participated in the crime of importation and by their actions sought to bring about its success. *See Nye & Nissen v. United States, supra,* 336 U.S. at 619, 69 S.Ct. 766.

In determining whether the government met its burden of proof, we review the evidence presented at trial in a light most favorable to the government as the prevailing party. *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). Applying that standard of review, we find that the evidence was sufficient to prove guilt of importation beyond a reasonable doubt.

The evidence clearly demonstrates that marijuana, a controlled substance, was imported from Mexico on the evening of July 17 and that each of the accused took an active role in the importation. The CB transmissions at Hidden Hills Dry Lake, Flickinger's purchase of the aeronautical charts for Mexico, and the fact that Flickinger landed soon after the close of the "drop" conversation indicate that Flickinger was involved in an airplane drop of marijuana imported from Mexico. After Flickinger was arrested on July 18, he stated to the agents that his occupation was a "dope runner" and described how he landed on the dry lake bed. During the process of placing Flickinger under arrest, the DEA agents found a Mexican travel permit in his name dated July 16, 1975, in his possession. In Flickinger's plane was found a portable CB radio, a gas receipt from Mazatlan, Mexico, dated July 17, 1975, and marijuana debris. This evidence clearly shows that Flickinger was involved in the importation of marijuana.

As to Munier, McLaughlin and Hayduk's roles, the evidence shows that they took an active part in the importation. They arrived at the lake bed concurrently and the vehicles in which they were earlier seen were pinpointed as the source of radio transmissions which indicated participation in a drop. The pickup in which McLaughlin and Hayduk were riding contained 31 sacks of marijuana. Based on this evidence, the district judge could have reasonably concluded beyond a reasonable doubt that Flickinger imported marijuana from Mexico and dropped it at the Hidden Hills Dry Lake. The judge could further properly conclude that the imported marijuana was transferred into the pickup truck after the drop and was being transported by McLaughlin and Hayduk at the time of their arrest. Further, he could reasonably conclude that Munier was aiding and abetting in the transaction.

Importation is a specific intent crime, requiring knowing or intentional importing of a controlled substance. Thus,

---

5. *Roper v. Beto,* 318 F.Supp. 662 (E.D.Tex. 1970), was also cited to us to show the unconstitutionality of the procedures at issue here. The decision of the lower court, however, was reversed on appeal. *Roper v. Beto,* 454 F.2d 499 (5th Cir. 1971), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2053, 32 L.Ed.2d 336 (1972).

the government was required to prove that the participants knew that the marijuana was imported. We find that the government met its burden of proof. There was direct evidence of Flickinger's knowledge. As to the remaining three, the evidence was circumstantial. However, an inference of criminal intent can be drawn from circumstantial evidence. *United States v. Kaplan*, 554 F.2d 958, 964 (9th Cir. 1977); *United States v. Childs*, 457 F.2d 173, 174 (9th Cir. 1972); *United States v. Oswald*, 441 F.2d 44, 47 (9th Cir. 1971).

The involvement of the participants in all aspects of this saga provides adequate evidence. Not only were all involved in the preparation of the venture, each was involved at the dry lake and actively in communication to further the plan. In addition, the 31 cloth sacks of marijuana were marked with Spanish writing, indicating that the sacks came from Mexico. A reasonable inference from the evidence is that the sacks of marijuana were transferred from the airplane to the pickup.

We find, then, that the evidence was sufficient to uphold the convictions on the importation count. This leaves only the sufficiency of the evidence on the conspiracy count and the count charging possession with intent to distribute. However, each received concurrent sentences on all three counts. Under the concurrent sentence doctrine, a federal appellate court, as a matter of discretion, may decide not to consider arguments advanced by an appellant with regard to one or more counts of an indictment if he was at the same time validly convicted of other offenses under other counts and concurrent sentences were imposed. *United States v. Pinkus*, 551 F.2d 1155, 1161 (9th Cir. 1977); *United States v. Moore*, 452 F.2d 576, 577 (9th Cir. 1971); *see generally Benton v. Maryland*, 395 U.S. 784, 787–91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Here, count 2, charging importation, is unassailable. We decline to consider the sufficiency of the evidence with regard to the remaining two counts.

VI.

Hayduk, joined by McLaughlin, Flickinger and Munier, argues that the government was improperly permitted to add indictment counts following the change of venue and therefore impermissibly punished each of them for exercising their right to a change of venue. If the challenge were well taken, it would lead to the dismissal of count 3, charging possession with intent to distribute, which was added following the change of venue, and possibly the dismissal of count 1, charging conspiracy, which was modified following the change of venue. *See United States v. Gerard*, 491 F.2d 1300, 1304–06 (9th Cir. 1974); *United States v. DeMarco*, 401 F.Supp. 505, 512 (C.D.Cal. 1975), *aff'd*, 550 F.2d 1224 (9th Cir. 1977). However, we have already upheld count 2. Under the concurrent sentence doctrine, we decline to consider this challenge to counts 1 and 3.

AFFIRMED.

KOELSCH, Circuit Judge, concurs in the result.