**UNITED STATES of America, Appellee,**

v.

**Shaun BALDACCHINO,**
**Defendant, Appellant.**

**No. 84–1108.**

United States Court of Appeals,
First Circuit.

May 20, 1985.

Charles Merle Gile, Oklahoma City, Okl., for defendant, appellant.

Charles E. Fitzwilliam, Asst. U.S. Atty., Hato Rey, P.R., with whom Daniel Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal from findings and rulings made at a pretrial hearing on motions to suppress and dismiss. Pursuant to Fed. R.Crim.P. 11(a)(2), defendant Shaun Vincent Baldacchino entered a conditional plea of guilty to importation of 1,389 pounds of marijuana and possession with intent to distribute in violation of 18 U.S.C. § 2, 21 U.S.C. §§ 841(a)(1), 952 (1982). Baldacchino alleges that his motions to suppress and dismiss the indictment should have been granted because: (1) he was arrested illegally, without probable cause; (2) all statements made by him were the fruits of an illegal arrest; (3) his statements should have been suppressed because they were not freely and voluntarily given; and (4) the government breached its plea agreement with him after dismissing the original indictment against him in exchange for his testimony by subsequently reindicting him. See 577 F.Supp. 12. We find that none of these challenges warrant reversal and affirm the district court's decision.

## I. THE FACTS

### A. The Smuggle

The tale of misadventure presented at the pretrial hearing involves a substantial cast of characters including seven defendants (one of whom became a government witness whose charges were dismissed), two unindicted coconspirators, and more than a dozen police officers. Baldacchino's participation began on May 5, 1983, when he was contacted at his home in Ardmore,

Oklahoma, by codefendant Octavio Font-Ramirez (Junior Font) and asked whether he would "retrieve" an airplane in Puerto Rico for a substantial amount of money. Baldacchino agreed, and in the following two days called codefendants Jerry McLean and Fred McNulty and asked them if they wanted to help him and make some money. Both McNulty and McLean agreed to participate.

Several days later Baldacchino and McLean flew to San Juan where they were met by Font. Font drove them to a car rental agency where Baldacchino rented an Aries station wagon. The three then drove to defendant Carlos Riollano's home where they discussed a drug smuggling plan which entailed Baldacchino and McNulty traveling to St. Thomas to get an airplane, flying it to Colombia, picking up a load of marijuana, and returning to Puerto Rico.

On Saturday, May 14th, McLean and Baldacchino went to the airport to pick up Baldacchino's friend, McNulty, who was also a pilot. The next morning, Baldacchino and McNulty caught a flight to St. Thomas. There, after receiving confirmation on the Colombian connection, he and McNulty flew to a secluded airstrip in Colombia where they were received by a group of Colombians who loaded the aircraft with marijuana and fuel. Around four o'clock in the afternoon, McNulty and Baldacchino took off for Puerto Rico. They planned to land in a field in Cabo Rojo that had been recommended by another codefendant, Jesus Velez Arroyo, known to Baldacchino as "Tarzan." However, while landing the plane, McNulty lost sight of the landing beacon and hit a tree, landing short of the intended runway. Baldacchino and McNulty got out of the plane and began helping Riollano, McLean, Font, Tarzan, a friend of Tarzan's, Tarzan's cousin, and another codefendant, Millan, load the marijuana into a Blazer (a four-wheel drive vehicle) that was parked on a dirt road next to a fence near the landing field. While they were unloading, the group spotted two vehicles approaching and fled. Font, Tarzan, and Tarzan's cousin took the Blaz-

er, while Riollano, Millan, Baldacchino, McNulty, and McLean fled on foot.

### B. *The Arrests*

Meanwhile, around 7:30 p.m. Puerto Rico Police Officer Padilla, who was visiting his parents in the Cabo Rojo area, heard a plane flying overhead, followed by a crashing sound. Padilla went to the local rescue unit and called Police Sergeant Vidro (director of the rescue unit) who contacted customs and narcotics agents. Padilla and another officer and three or four members of a civilian rescue unit headed for the crash site. The officers and the civilians located the plane with the headlights of their vehicles. After calling out to see if there was anyone injured inside the plane and getting no answer, they waited for drug and customs agents to arrive. At approximately 8:30 Puerto Rico Police Officers Vidro, Fumero, and Garcia arrived. Shortly thereafter Padilla noticed some tire marks in the grass leading away from the plane site. Padilla, Vidro, Fumero, and Garcia went to investigate, leaving the other officer with the airplane. They discovered a black Blazer and Dodge van containing bales of marijuana about a kilometer from the plane and about 100 feet from an access road.

Meanwhile, Sergeant Vidro had contacted Lieutenant Vargas and Agents Ramirez and Rosa of the Narcotics Division of the Puerto Rico Police Department.

Enroute to the crash site, Ramirez and Rosa came upon a grey Aries station wagon parked on the shoulder of the wrong side of the road with its parking lights on. Rosa slowed down and switched on his high beams when he got about thirty to thirty-five feet from the station wagon. He was able to see a driver in the station wagon. As the police approached the car they saw three men, two of whom appeared to be Caucasian, emerge from a clump of bushes about five feet from the side of the road. The three men ran to the Aries station wagon and jumped in. The station wagon then took off past the police officers' car. Ramirez swiveled around and scribbled

down the license plate number as the station wagon sped away and Rosa turned the car around to pursue the station wagon. By the time he had turned the car around, however, the station wagon was far ahead of them and they lost track of it. Between 9:30 and 9:45 Ramirez radioed the police dispatcher the Aries license plate number and the narcotics officers continued on to the site of the crash.

Approximately fifteen minutes later, Rosa and Ramirez arrived at the plane site where Padilla was waiting. Ramirez put several bales of marijuana that were lying outside the plane into his car and then entered the plane to look around; Rosa followed. Ramirez testified that he found a passport belonging to Baldacchino and a torn pants pocket with a design or writing on it in the cockpit area of the plane. Ramirez testified that he showed the passport to Rosa and remarked that the person in the passport picture was the second person they had seen run from the bushes. Ramirez kept the passport and pocket. After Rosa searched the back of the plane, Ramirez and Rosa left to examine the Blazer and van. After examining the van, they and Officer Fumero went to look for the Aries station wagon that Ramirez had reported. Fumero spotted it parked in front of a guesthouse and radioed Rosa and Ramirez. Fumero then waited in his own car about two hundred meters from the guesthouse.

About ten minutes later Ramirez and Rosa pulled up next to the Aries. Ramirez spotted a man, later identified as Riollano, taking some clothes out of the rear passenger door of the station wagon and recognized him as the third person he saw running from the bushes. Ramirez jumped out of his car and chased Riollano up the guesthouse stairs through a door at the top of the second story landing and into room number five. He immediately arrested Riollano. Rosa followed Ramirez up the stairs and into room five, as did Lt. Vargas who had arrived a moment or two after Ramirez and Rosa. Vargas and Rosa arrested Riollano's two companions, Font and Millan. Ramirez, Rosa, and Vargas then turned the three defendants over to Lt. Garcia and Sgt. Vidro who had also arrived at the guesthouse and were on their way up the stairs to the second story landing. Garcia and Vidro returned to the street with Riollano, Millan and Font in custody. Lt. Vargas and Officers Ramirez and Rosa testified that they heard shuffling in room four and Rosa testified that he heard English speaking voices as well. Ramirez then, without knocking or identifying himself, attempted to force open the door to room four by throwing his shoulder against it. After two unsuccessful attempts, the door opened.

Inside room four were Baldacchino, McLean and McNulty. Ramirez identified Baldacchino as the second person out of the bushes. Vargas told Baldacchino, who was in his underwear, to put on his clothes. When he put on his jeans one of the officers pointed at his pants and began laughing because one of Baldacchino's back pockets was missing. Vargas instructed Ramirez to read Baldacchino his rights. Ramirez recited *Miranda* warnings in English and handed Baldacchino a card with the warnings written on it in English. McLean, McNulty and Baldacchino were then taken to the police station.

C. *Questioning at the Police Station*

Baldacchino and the other five men arrested at the guesthouse were brought to the police station between approximately 12:00 a.m. and 2:00 a.m. Ruiz, a United States Customs Officer who had inspected the Blazer and van, took charge of questioning. Ruiz testified that he gave Baldacchino his rights at approximately 2:30 a.m. and asked if he had anything to do with the plane crash. Ruiz advised Baldacchino that the best thing he could do was to cooperate, and that Ruiz would forward any information Baldacchino could provide to the Drug Enforcement Administration and the United States Attorney for consideration. Ruiz also indicated that the determination of Baldacchino's case was up to the DEA.

At approximately 3:00 to 3:30 Baldacchino said that he wanted to make a statement and requested that McLean be present. Baldacchino then wrote out a short statement in which he admitted flying as a passenger with McNulty to Colombia to pick up marijuana. Both Baldacchino and McLean signed the statement which stated at the bottom that it had been given freely and voluntarily.

Around 5:30 Ruiz brought Baldacchino a waiver of rights form which Baldacchino signed in front of Ruiz and Ruiz's partner after acknowledging that he understood it. After the waiver was signed, Baldacchino asked about the effect of his cooperation and Ruiz told him that if the case went to the United States government, the United States Attorney would make the final decision. Ruiz also said that if Baldacchino cooperated "it would probably go easier on him." Baldacchino then affirmed the truth of his earlier written statement.

DEA Agents Jiminez and Hernandez arrived at the police station the next morning. Hernandez testified that he thought Agent Jiminez had again read Baldacchino his rights. Hernandez testified that he saw Baldacchino writing out a statement in the presence of Agent Jiminez around 9:00 a.m.

Later that afternoon Hernandez drove Baldacchino from the local police station where he was being held to San Juan to be arraigned. On the way to San Juan, Hernandez stressed the importance of Baldacchino's telling the truth and taking advantage of his opportunity to speak to the United States Attorney. Baldacchino subsequently spoke to United States Attorney de Jesus and stated that he would give his full cooperation to the government. He also told them that he had knowledge of and could give information regarding other narcotics operations.

On May 19th Baldacchino signed an agreement with United States Attorney de Jesus in which he agreed to fully cooperate with the DEA and United States Attorney's office and to testify before the Federal Grand Jury and at trial, if necessary, concerning his participation in the smuggling venture and the participation of others in that crime or other crimes of which he had knowledge. In exchange for Baldacchino's cooperation, the government agreed to dismiss without prejudice any charges against Baldacchino after he had completed his part of the agreement. The agreement stated that if Baldacchino did not fully and truthfully cooperate, the government would use all of his statements against him in any legal proceedings. Baldacchino was then released on his own recognizance along with McLean who also promised to testify pursuant to a similar plea agreement. After the plea agreements were signed, they returned to Oklahoma.

In early June Baldacchino was asked to come back to Puerto Rico. He and McLean flew back, believing that they were going to testify before the grand jury. The government had in the meantime, however, obtained the cooperation of McNulty. He had provided information which, together with information from various police officers involved in the arrests, led the government to believe that neither McLean nor Baldacchino had told the truth in the oral and written statements given to the DEA. When McLean and Baldacchino arrived in San Juan on June 8th, they were rearrested on a superseding indictment that charged, in addition to the original counts, that each intentionally made false and fraudulent statements and withheld information from the DEA in violation of 18 U.S.C. §§ 2 and 1001 (1982).

After his unsuccessful motions to dismiss the indictment and suppress the passport, the pocket, the jeans without the pocket, and the statements made subsequent to his arrest, Baldacchino, pursuant to Fed.R.Crim.P. 11(a)(2), entered a conditional plea of guilty to Counts 2 and 4 that alleged possession with intent to distribute and importation of marijuana.

## II. PROBABLE CAUSE TO ARREST

Baldacchino alleges that his arrest was illegal because the government did not have probable cause to arrest him in the

guesthouse. The findings of the district court in a suppression hearing are binding on appeal unless they are clearly erroneous, *United States v. Jobin*, 535 F.2d 154, 156 (1st Cir.1976); *United States v. Cepulonis*, 530 F.2d 238, 244 (1st Cir.), cert. denied, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976), and the credibility of the witnesses is particularly within the competence of the trial court. *United States v. Jobin*, 535 F.2d at 157.

■ "Probable cause exists where 'the facts and circumstances within the [arresting officers'] knowledge ... [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' " the suspect had committed or was committing an offense. *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). The determination of whether probable cause exists must not rest on isolated facts; rather, it depends upon the cumulative effect of the facts in the totality of circumstances. Probability, not a prima facie showing of criminal activity, is the standard of probable cause. *Illinois v. Gates*, 462 U.S. 213, 231–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983); *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

Baldacchino contends that the district court's finding of probable cause was clearly erroneous because the police did not find the passport and the pants pocket in the plane as they testified, but in his room after a room-to-room search of the upstairs of the guesthouse. Baldacchino further attempts to undercut probable cause by contending that Ramirez and Rosa did not see him running from the bushes and getting into the Aries, and that Fumero did not spot the Aries at the guesthouse.

■ We agree with the district court that there was probable cause for the arrest. Not only did four police officers testify that they saw or were informed about the pocket and passport prior to their arrival at the guesthouse, but Baldacchino's version of the confiscation of his passport doesn't withstand scrutiny. He testified that Vargas picked up the passport in his

room, held it up to his face, and remarked that he was from Oklahoma. Baldacchino, however, is Canadian, and the passport was issued in Dallas, Texas. Nowhere on the page with his picture or on the facing page does the passport indicate that Baldacchino is from Oklahoma. Baldacchino also testified that one of the arresting officers in his room at the guesthouse pointed at his pants and began laughing. Such a response would make sense only if the officers had previously found the pocket that belonged to those pants.

Baldacchino did not offer any explanation as to how the police could have traced him to the guesthouse if Rosa and Ramirez did not, in fact, see him flee in the Aries station wagon. We affirm the district court's determination that the police had probable cause to believe that Baldacchino was involved in criminal smuggling activity.

## III. WARRANTLESS ENTRY INTO DEFENDANT'S ROOM

■ Although his brief is not clear on this, Baldacchino also appears to challenge his arrest on the grounds that it was made after a warrantless forced entry into his motel room. In *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964), the Court held that the constitutional protections against unreasonable searches and seizures of homes extend to guest rooms in commercial establishments. *See also United States v. Jones*, 696 F.2d 479, 486–87 (7th Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *United States v. Bulman*, 667 F.2d 1374 (11th Cir.), cert. denied, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). Since the police have the burden of showing the legality of a warrantless arrest, *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), and no evidence was introduced to show that Baldacchino was a trespasser in the inn or had no legitimate privacy interest in the room in which he was arrested, we must assume that he was a guest and that he had the same right of privacy that

one would have against an intrusion into one's private dwelling.

The police deny Baldacchino's claim that they forced open the door to his room. Ramirez testified that he did try to force the door open by twice ramming his shoulder against it but that Baldacchino voluntarily opened the door as Ramirez was ramming it a third time. Resolution of the disagreement about the manner of entry is unnecessary because, even under the government's version, the entry into the room was not consensual. *See Payton v. New York*, 445 U.S. at 583, 100 S.Ct. at 1378 (police entering dwelling after young son answered door without affording defendant chance to object or consent not consensual); *United States v. Blake*, 632 F.2d 731, 733 (9th Cir.1980) (woman opening door in response to it being kicked by FBI agents did not consent to entry). The question, therefore, is whether there were exigent circumstances justifying a nonconsensual, warrantless entry.

### A. *Exigent Circumstances*

■ The burden of showing exigent circumstances rests upon the government.

[T]he Court has recognized, as "a 'basic principle of the Fourth Amendment law [,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. at 586 [100 S.Ct. at 1380]. *See Coolidge v. New Hampshire*, 403 U.S. 443, 474, 475 [91 S.Ct. 2022, 2042, 2043, 29 L.Ed.2d 564] (1971) ("a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show ... the presence of 'exigent circumstances.' ")

*Welsh v. Wisconsin*, — U.S. —, —, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). Although ·the legal implications of the nonconsensual entry were never articulated by the parties or addressed by the district court, the facts necessary for such a determination are part of the record. We, therefore, examine the evidence to determine whether exigent circumstances were, in fact, present.

"[T]he term 'exigent circumstances,' in conjunction with an arrest in a residence, refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Blake*, 632 F.2d at 733 (quoting *United States v. Flickinger*, 573 F.2d 1349, 1355 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978)). While the Supreme Court has not determined the scope of the exception for exigent circumstances, it has stated that "exceptions to the warrant requirement are few in number and carefully delineated." *Welsh v. Wisconsin*, — U.S. at —, 104 S.Ct. at 2097; *United States v. United States District Court*, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972). The Court has recognized exigent circumstances in cases involving hot pursuit (*United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967)); destruction of evidence (*Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966)); and threats to public safety (*Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (ongoing fire)).

In determining whether the circumstances of a case fall into one of the emergency conditions characterized as exigent circumstances, the court must consider: the gravity of the underlying offense; whether delay poses a threat to police or the public safety; the likelihood that the suspect will escape if not quickly apprehended; and whether there is a great likelihood that evidence will be destroyed if the arrest is delayed until a warrant can be obtained. *See Welsh v. Wisconsin*, — U.S. at —, 104 S.Ct. at 2098; *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782; *Dorman v. United States*, 435 F.2d 385, 392 (D.C.Cir.1970); 2 W. LaFave, *Search and Seizure* § 6.1 (1978).

Since the police had no grounds for believing that Baldacchino and his cohorts were armed or presented a risk to the

public or police, we look to see whether either the "hot pursuit" or the "destruction of evidence" exceptions justified a warrantless entry into Baldacchino's room. "Hot pursuit" has been defined as some sort of chase, although it need not be an extended hue and cry, in and about the public streets. *United States v. Santana*, 427 U.S. at 43, 96 S.Ct. at 2410. The pursuit must be immediate or relatively continuous to justify the failure to secure a warrant. *Welsh v. Wisconsin*, — U.S. at —, 104 S.Ct. at 2098 (claim of hot pursuit found unconvincing where there was no immediate or continuous pursuit of the petitioner from the scene of the crime).

▮ In this case, the plane crash at approximately 8:00 p.m. set in motion a continuous series of investigative steps by a dozen police officers involving four sites that culminated in the six arrests around midnight. It was clear to the police officers that Baldacchino had been on the move since the plane crash. He and his cohorts originally left the plane crash site when they saw headlights coming toward them so they were well aware that their smuggling enterprise had been discovered and that they were being pursued or soon would be pursued. When Ramirez and Rosa spotted the Aries at the side of the road, Baldacchino, McNulty and Riollano were obviously fleeing. The discovery of three of the smugglers in one room of the guesthouse and the Aries in the inn's parking lot certainly gave the police grounds to reasonably believe that other smugglers were elsewhere in the inn and would flee as soon as they knew that their confederates had been arrested.

The officers also had reason to believe that any delay would allow the other smugglers to dispose of incriminating evidence. *See Schmerber v. California*, 384 U.S. at 770, 86 S.Ct. at 1835. When the police entered room five, two of the defendants were washing their clothes to remove telltale signs of mud picked up at the crash site. The police had also found cocaine near the plane which, unlike bales of marijuana, can easily be hidden or destroyed.

Considering the continuity of the investigation, the brevity of the time period between discovery of the crime and the arrests, the fact that Baldacchino and company were actively fleeing the police, and the likelihood that material evidence would be lost if apprehension were delayed, we find exigent circumstances sufficient to justify a warrantless entry into room number four provided that the police had reason to believe that Baldacchino was inside. That is the next issue.

B. *Reason to Believe Baldacchino in Room Four*

▮ When a structure is divided into more than one residential unit there must be cause to search each unit. *United States v. Whitten*, 706 F.2d 1000, 1008 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981). A search covering an entire street address is authorized where probable cause exists as to one portion of a multiunit building only when the building is used as a single entity or the suspect is in control of the whole premises. *Whitten*, 706 F.2d at 1008.

In *Payton v. New York*, the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within.*" *Id.* 445 U.S. at 603, 100 S.Ct. at 1388 (emphasis added). *See also Steagald v. United States*, 451 U.S. 204, 223, 225, 226, 101 S.Ct. 1642, 1654, 1655, 68 L.Ed.2d 38 (1981) (Rehnquist, J., dissenting) (citing probable cause to believe suspect within home as critical fact for not needing arrest warrant before entering residence of third person). To hold otherwise would be to allow police to invade the privacy of numerous innocent people. *See Fisher v. Volz*, 496 F.2d 333, 343 (3d Cir.1974) (§ 1983 action); *United States v. Pacheco-Ruiz*, 549 F.2d 1204 (9th Cir.1976); *United States v. Cravero*, 545 F.2d 406, 421 (5th Cir.1976), *cert. denied,*

429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 and 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *Government of the Virgin Islands v. Gereau,* 502 F.2d 914 (3d Cir. 1974), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir.1966) (§ 1983 action).

In this case the police had good reason to believe that Baldacchino was at the inn. They did not, however, inquire of the innkeeper whether any other guests had arrived with those staying in room five. Exactly what procedures the police *did* follow to determine where other conspirators were located was disputed at the hearing. Baldacchino claims that the police conducted a comprehensive room-to-room search without cause to believe he was in any particular room. The innkeeper testified that the doors to rooms one, two and three had been forced open and that the belongings of the guest in room one had been ransacked and his wallet confiscated.

Officer Ramirez testified that he heard "shuffling" in room four which caused him to try to force his way in. Lt. Vargas testified that Ramirez might also have heard some English speaking voices but did not claim that he also heard them. Ramirez did not affirm Vargas' conjecture. Officer Rosa, however, testified that "we opened that door because we heard some running around and it was the only one that we opened and they were speaking in English inside." While we could not condone an indiscriminate room-to-room search, the district court found that English speaking voices were heard in room four before the police entered.[1] Although this is a close question, we must defer to the district judge who saw the witnesses and had a chance to observe their demeanor. The use of English, together with the presence of other defendants in the adjoining room and the lateness of the hour, gave the police sufficient reason to believe that one of the Caucasians they had seen get into the Aries was in room four. The entry and arrest were, therefore, valid.

## IV. STATEMENTS MADE AT POLICE STATION

In addition to his "fruit of the poisonous tree" claim, Baldacchino argues that the statements he made following his arrest are inadmissible because they were not voluntarily given. He claims that he was first given *Miranda* warnings two hours after he had made his first statement with McLean and, even if he were given warnings in the guesthouse, they were given by Ramirez who could not speak English well and who would not have understood if Baldacchino had asserted any of his rights. He further alleges that his statements were made in response to unfair inducements in the form of promises of clemency that were later revoked.

Baldacchino's claims of involuntariness are completely without merit. Vargas, Rosa, and Ramirez all testified that Vargas instructed Ramirez to read Baldacchino his rights in English, which he did. Ramirez then handed Baldacchino a card on which his *Miranda* warnings were typed. Although Ramirez did not speak or understand English very well, Vargas was present and Ramirez testified that Vargas would have understood had one of the arrestees requested a lawyer or telephone. Vargas does not recall Baldacchino requesting a lawyer or permission to use the phone and Baldacchino doesn't allege that he made any such requests at that time.

Numerous officers testified that Baldacchino was advised of his rights prior to the giving of any statements at the police station on the night and morning of May 17. Moreover, the two statements Baldacchino wrote out each included a sentence indicating that he was giving the statements freely and voluntarily. The district court's finding that Baldacchino was given *Miranda* warnings prior to the mak-

---

1. Although English is spoken in Puerto Rico, Spanish is the language used by the vast majority of residents.

ing of any statements is amply supported by the record.[2]

■ Baldacchino also alleges that his incriminating statements were induced by promises of leniency or clemency if he would cooperate. Officer Ruiz testified that the inducements consisted of telling Baldacchino that the best thing he could do was cooperate and that if Baldacchino did make a statement he would notify the Federal Drug Enforcement Administration and the United States Attorney regarding Baldacchino's cooperation. A promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible. *United States v. Fera*, 616 F.2d 590, 594 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980). *See also United States v. Curtis*, 562 F.2d 1153, 1154 (9th Cir.1977), *cert. denied*, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Springer*, 460 F.2d 1344, 1347 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972). We affirm the district court's holding that Baldacchino's post-arrest statements were admissible.

## V. BREACH OF THE PLEA AGREEMENT

Finally, Baldacchino alleges that the government breached its plea agreement when it reindicted him in June when he returned to Puerto Rico. He also claims that the government led him to believe that he would be testifying before the grand jury and that he would not have returned if he knew he was going to be indicted and arrested.

■ The Supreme Court has recognized that plea bargain agreements must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. *Santobello v. New York*, 404 U.S.

257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Though a matter of criminal jurisprudence, plea bargains are subject to contract law principles insofar as their application will insure the defendant what is reasonably due him. *United States v. Arnett*, 628 F.2d 1162 (9th Cir.1979); *United States v. Bridgeman*, 523 F.2d 1099, 1109–10 (D.C. Cir.1975), *cert. denied*, 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976).

■ Contract principles, however, cannot help Baldacchino because he did not live up to his promise to fully and honestly cooperate with the government. Baldacchino admitted at the pretrial hearing that his statements made to the police before he executed the plea agreement were "not near the truth," yet he made no effort to clarify them to the United States Attorney, either at the time of the execution of the agreement or thereafter. The government was not bound to call Baldacchino before the grand jury and wait to see if he would tell the complete truth when there was no indication that he would do so and every indication he would not. His claim that he was "tricked" into coming to Puerto Rico may be true, but he could have been indicted whether or not he was in Puerto Rico. Baldacchino seems to think that the government should have given him an opportunity to flee after he was reindicted. The government has no duty to give an indicted criminal a head start. That the government did not abandon the agreement in bad faith or on a whim is further evidenced by the fact that the superseding indictment included an additional count alleging that Baldacchino had made false statements to the Drug Enforcement Administration. There is no basis for invalidating the second indictment.

*Affirmed.*

