446 A.2d 927

**COMMONWEALTH of Pennsylvania**

v.

**Daniel J. ELIFF, Bruce W. Bechtold, and Richard A. Hogle, Appellants.**

Superior Court of Pennsylvania.

Submitted March 6, 1980.

Filed June 11, 1982.

Edwin D. Strite, Jr., Assistant Public Defender, Chambersburg, for appellants.

John F. Nelson, Chambersburg, for Commonwealth, appellee.

Before CERCONE, President Judge, and WATKINS and MONTGOMERY, JJ.

CERCONE, President Judge:

Appellants were charged with possession of a controlled substance with intent to deliver, 35 P.S. § 780–113(a)(30) [1]

---

1. 35 P.S. § 780–113(a)(30) reads:
   Prohibited acts; penalties
     (a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:
     \* \* \* \* \* \*
     (30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

and criminal conspiracy, 18 Pa.C.S. § 903.[2] In their omnibus pre-trial motions appellants sought to suppress the Commonwealth's evidence against them contending that it had been variously obtained in violation of their Fourth Amendment right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const., 4th Amend. In their motions to suppress, appellants contended that the entry into their residence to arrest appellant Hogle on unrelated charges was (1) illegally effectuated because it was done without a valid warrant for his arrest, and (2) without a valid warrant authorizing a search of the premises, and (3) in the absence of exigent circumstance obviating the need for warrants. They also argued that the entry to effectuate the arrest was improperly executed and that their right to be free from unreasonable intrusions by the state was violated thereby. They further contended that the evidence obtained pursuant to search warrants issued subsequent to the initial entry was "fruit of the poisonous tree," *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and therefore subject to suppression. Appellant Eliff individually contended that certain statements he made were suppressible because of the dictates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1967), and *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). Appellant Bechtold separately contended that the search of his room was improper because the room was a separate dwelling and not properly within the scope of the search warrant. The suppression court denied the motions for the suppression of the evidence. The cases against appellants were tried jointly before the same

**2.** 18 Pa.C.S. § 903 reads in pertinent part:
Criminal Conspiracy

(a) Definition of Conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

judge who heard the motion for suppression, and without the aid of a jury. The court found defendants guilty on all counts and sentenced each of them to prison terms of one to five years plus fines on the drug charges and probation on the conspiracy convictions to run consecutively to the prison terms. It is from these judgments of sentence that the instant appeal comes before us.

The scope of our review of the denial of a motion for suppression of evidence is firmly established. The suppression court must make findings of fact and conclusions of law in determining whether evidence was obtained in violation of the defendant's rights. The burden of proving the admissibility of the evidence lies on the Commonwealth's shoulders; the standard by which the court determines the legitimacy of the search and seizure, and hence the admissibility of the evidence whose suppression has been moved, is that of the preponderance of the evidence. Pa.R.Crim.P. 323(h). On appeal we must determine whether the record supports the factual findings of the suppression court, as well as determine the reasonability of any inferences and legal conclusions drawn from the court's findings of fact. *Commonwealth v. Goodwin*, 460 Pa. 516, 522, 333 A.2d 892, 895 (1975); *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974); *Commonwealth v. Sharpe*, 449 Pa. 35, 296 A.2d 519 (1972); and see *Commonwealth v. Burgwin*, 254 Pa.Superior Ct. 417, 386 A.2d 19 (1978) (Opinion in Support of Reversal, per Price, J.).

In considering whether the record supports the court's finding of facts we must restrict ourselves to reviewing the evidence presented by the Commonwealth and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *See Commonwealth v. O'Bryant*, 479 Pa. 534, 537, 388 A.2d 1059, 1061 (1978); *Commonwealth v. Hughes*, 477 Pa. 180, 383 A.2d 882 (1978); *Commonwealth v. Seibert*, 274 Pa.Superior Ct. 184, 418 A.2d 357 (1980). In addition, where the suppression court's findings are amply supported by the record they may not be disturbed on appeal. *Common-*

*wealth v. O'Bryant, supra; Commonwealth v. Bundy, supra; Commonwealth v. Seibert, supra.* Finally, in deciding whether Fourth Amendment dictates have been abridged, we must consider all of the circumstances of the official intrusion, keeping firmly in mind that the ultimate goal of the Amendment is not the protection of preferred locales, but the protection of individuals and their legitimate expectations of privacy. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Moreover, only those with "actual standing" will be heard to complain of alleged Fourth Amendment violations. See *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 68 L.Ed.2d 619 (1980); *Commonwealth v. Sell,* 288 Pa.Superior Ct. 371, 432 A.2d 206 (1981).[3]

## The Facts

In July of 1977 Agent Joseph Bilansky of the State Bureau of Drug Control began an investigation into the trafficking of illicit drugs in the vicinity of Chambersburg, Franklin County. Among the objects of the investigation were a certain farmhouse in Letterkenny Township and its occupants. On or about July 28, 1977, appellant Hogle, one of the residents of the farmhouse under surveillance, sold an unspecified quantity of marijuana to Agent Joel Hicks, an undercover agent working under the direction of Agent Bilansky. The sale was accomplished in the parking lot of a fast-food restaurant in Chambersburg. Following the purchase of the marijuana from appellant Hogle, Agent Hicks informed Agent Bilansky and Officer Thomas of the Chambersburg Police Department of the transaction. On October 26, 1977 Officer Thomas swore out warrants for Hogle's arrest based on the information he had obtained from Agent Hicks.[4] The following day Agent Bilansky met Officer

---

**3.** Appellants were all residents of the house in which they were arrested. The police knew that Eliff was the house's lessee, and that Hogle was living there. *See* n. 10 *infra.*

**4.** The Commonwealth has stipulated that the warrants were invalid because Officer Thomas failed to make a showing of sufficient

Thomas, whereupon the latter informed Agent Bilansky of the warrants for Hogle's arrest. The two discussed the method they would use in effectuating Hogle's arrest. They decided that they could effectuate the arrest without assistance if they found Hogle at his mother's home in Chambersburg, but that they would need additional manpower to arrest him if they were obliged to do so at the Letterkenny Township farmhouse, because of the occupancy of the house by several persons.

They proceeded to the home of Hogle's mother. She informed Agent Bilansky that Hogle was not to be found there, but rather, at the farmhouse. They arranged for assistance and agreed to meet the other officers at a rendezvous point near the farmhouse. Before arriving at the rendezvous point, Agent Bilansky and Officer Thomas drove past the farmhouse. The house was lighted and visible from the road. By spying through a first floor window as they drove past, both men were able to discern a group of several people gathered in one of the rooms. Agent Bilansky could not identify any of the occupants but Officer Thomas did observe Hogle among the group. Agent Bilansky and Officer Thomas met Agent Hicks, the undercover agent who made the marijuana purchase from Hogle, and four members of the Chambersburg Police Department, Detective Snively and Officers Haldemann, North and Manns, at the rendezvous point. The latter three were in full uniform. The group proceeded on foot to the farmhouse. Two uniformed officers took up preassigned positions outside the house intended to prevent Hogle's possible escape. The remainder of the group approached the farmhouse, with Agent Bilansky in the lead. He was wearing his badge on the outside of his denim jacket.

Perceiving the presence of intruders, some dogs kept on the premises raised sufficient ruckus that appellant Eliff, one of the residents of the farmhouse, came out onto the

probable cause to the magistrate to justify their issuance. The suppression court accepted the stipulation, although reluctantly.

front porch to investigate, leaving the door into the living-room slightly ajar behind him. Just as he emerged from the house Agent Bilansky and the others came onto the porch. Eliff inquired as to what was "going on," and Bilansky responded by flashing an identification card and stating that he had warrants for Hogle's arrest. Before Eliff could ask to see the warrant Agent Bilansky and the other law officers had entered the house by the same door through which Eliff had come onto the porch. By Agent Bilansky's own testimony no more than twenty seconds elapsed from the time he encountered Eliff until he crossed the threshold of the house. The officers entered swiftly, at a pace described by Agent Bilansky as faster than a walk but less than a full run. Eliff followed them into his house, demanding to see the arrest warrant.

Upon entering the livingroom Agent Bilansky shouted to the male (appellant Bechtold) and two females he found there: "Police! Everybody freeze! Put your hands on the top of your heads where we can see them!" Only after entering the livingroom did he smell the odor of burning marijuana. Prompted by the marijuana's distinctive odor he quickly surveyed the room and observed two hand-rolled cigarettes, a small quantity of vegetable matter which appeared to be marijuana, and some small chunks of compressed matter which he believed to be hashish. He passed through the room, leaving its three occupants in the hands of his associates, and followed by at least one other officer and Eliff, the latter still demanding to be shown the arrest warrant, mounted the stairway to the second story. They found Hogle in the second floor bathroom, placed him under arrest, and took him downstairs to the livingroom, where he was read his *Miranda* rights. All five occupants of the house were assembled in the livingroom. They were told they would be detained until Agent Bilansky and Officer Thomas could secure a warrant for the search of the house. Eliff, Bechtold and the two women were read their *Miranda* rights. The five were not permitted to move from the

livingroom, nor were they permitted to make any telephone calls. Agent Bilansky and Officer Thomas left at approximately 8:00 p. m. to obtain a search warrant.[5] Agent Bilansky and Officer Thomas secured the search warrant at 9:31 p. m. and returned to the farmhouse. The lessee of the farmhouse, Eliff, was read the search warrant and again advised of his *Miranda* rights. The search began at 9:56 p. m. and lasted until 2:45 a. m. the next day.

At approximately 11:00 p. m. Hogle was taken for arraignment. At an unspecified time after 9:56 p. m. the two women were released from detention and permitted to leave the premises. In the course of the search quantities of hashish, marijuana, LSD, cocaine and heroin were found together with scales and weights, plastic bags, currency, records, pills, capsules, dried mushrooms and sundry other drugs and paraphernalia. During the search of Eliff's room, which was done in his presence, Agent Bilansky discovered some marijuana and voiced an opinion as to its origin; Eliff contradicted him and stated that it had come from elsewhere.[6] At approximately 2:30 a. m. Eliff told Agent Bilansky that they had "... got it all." While searching Bechtold's room Agent Bilansky found a padlock on the floor. He demanded to see Bechtold's keys; upon testing them he

5. The farmhouse in question contains a livingroom, hallway, kitchen and dining room on the first floor; three bedrooms, a hallway and a bathroom on the second floor and a third floor attic. There were no partitions dividing the house into separate quarters nor are there any barriers or partitions separating the bedrooms other than their walls and doors.

Because the magistrate in whose district the farmhouse is situate could not reach his office for some time, the officers went to a magistrate in a nearby district who issued the warrant for the search of the entire house.

6. The suppression court's finding of fact on this point reads: "Subsequent to defendant Eliff having been advised of his Miranda rights, at least once, he was taken to his bedroom to observe the search of that room. ... The agent found a substances [sic] he believed to be marijuana and stated either, 'It looks like Columbian,' and Eliff volunteered, 'No, it's Acapulco Gold,' or the agent stated, 'It looks like Acapulco Gold' and Eliff volunteered, 'No, it's Columbian.' The agent immediately reminded Eliff of his Miranda rights."

found one which fit the padlock and seized it and the lock as evidence of Bechtold's residence in that room.[7]

At approximately 3:00 a. m. Bechtold and Eliff were transported to the Chambersburg Police Department Headquarters where they were processed and jailed. They had spent seven hours and twenty minutes in police detention, incommunicado. They were arraigned at 6:55 a. m. October 28, 1977. Hogle was arrested at 7:45 a. m. on October 28, 1977 for the charges arising out of the search of the farmhouse.

## Questions on Appeal

Appellants contend on appeal that the entry into their home to arrest appellant Hogle was illegally accomplished. They argue that their legitimate expectations of privacy guaranteed by the Fourth Amendment to the United States Constitution were violated by the way in which Hogle's unwarranted arrest was made. Flowing from that claim is the claim that the marijuana and hashish discovered in plain view once the illegal entry had been made, and the other drugs and drug paraphernalia uncovered as a result of the search of the house made pursuant to a search warrant the probable cause for which was illegally obtained, constitute the fruits of an illegal entry. They argue that all this evidence is "fruit of the poisonous tree" under *Wong Sun v. United States, supra,* and should have been suppressed. Finally, they contend that it was error not to suppress this evidence and that they should be awarded new trials as a result. For the reasons stated below, we agree with appellants, and now reverse their convictions and remand the case to the lower court for the appropriate proceedings below.

The lower court concluded that the entry into the farmhouse was legal because the police officers had probable cause for the arrest and knew Hogle to be present when the

7. This was of significance because Bechtold originally denied he lived there. He was not taken to observe the search of the room in which the padlock was found until after Agent Bilansky discovered, in searching the room, a letter addressed to Bechtold at the farmhouse.

entry was made. The court also concluded the officers did not violate appellants' constitutional right to be free from unreasonable searches and seizures for the same reason. Thus, it concluded that no warrant was necessary to arrest Hogle in his home. The United States Supreme Court and the Supreme Court of Pennsylvania have both concluded otherwise. See *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Commonwealth v. Williams*, 483 Pa. 293, 396 A.2d 1177 (1978). The suppression court did not consider the question of warrantless entry and arrest where there are exigent circumstances despite the contention in the pre-trial motions that no such circumstances were present. However, on post-verdict motions the court concluded that there had been exigent circumstances present to allow the entry, citing *Dorman v. U.S.*, 435 F.2d 385 (D.C.Cir.1970). Appellants contend that this conclusion was erroneous. We need not discuss the question because the *Dorman* holding is inapplicable to this case. This is so because of the Pennsylvania Supreme Court's ruling in *Commonwealth v. Miller*, 490 Pa. 457, 417 A.2d 128 (1980).

■ The Pennsylvania Supreme Court followed *Dorman* when it decided *Commonwealth v. Williams*, 483 Pa. 293, 396 A.2d 1177 (1978), and held that an arrest warrant is necessary to arrest a suspect in his own home absent exigent circumstances. The Court applied *Williams* retroactively in the case of *Commonwealth v. Wagner*, 486 Pa. 548, 406 A.2d 1026 (1979). Despite its retroactive application of the *Williams* rule in *Wagner* the Court held in *Commonwealth v. Miller, supra*, that the rule is not to be applied retroactively, but rather prospectively from the date of the decision of *Williams*—November 18, 1978. *Cf. Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

Additionally, the suppression court concluded that the method used to effectuate Hogle's arrest was proper, that the police thus had a right to enter the house as they did, that once having so entered they saw in plain view items which they reasonably believed to be controlled substances, and thus that the search warrant issued properly. Accordingly, it denied suppression of the evidence on that ground.

Appellants assigned this ruling by the suppression court as error in their post-verdict motions, where it was again denied. Having properly preserved the question for appeal, it is now asserted in this Court.

Prior to *Williams* the law in Pennsylvania was that no warrant was necessary to arrest a suspect in his own home when the police had probable cause to arrest. Thus, when the police believed a suspect to be present in his home they were permitted to enter the home and effectuate the arrest without a warrant. Reduced to its essence under the prior law, a warrantless arrest of a suspect in his home was the legal equivalent of a warranted arrest. Both types of arrest are controlled by the Fourth Amendment's prohibition against unreasonable searches and seizures. U.S.Const., 4th Amend.

One line of cases in this Commonwealth makes it clear that in the absence of exigent circumstances precipitate entry by the police into a suspect's home is not permitted. These are the familiar "knock and announce" cases. See *Commonwealth v. Newman*, 429 Pa. 441, 240 A.2d 795 (1968); *Commonwealth v. McCloskey*, 217 Pa.Superior Ct. 432, 272 A.2d 271 (1970). Concerning the exigent circumstances permitting waiver of the knock and announce rule, we recently stated:

Although exigent circumstances must be determined on a case-by-case basis, certain factual situations have been found to warrant a waiver of the "knock and announce" rule. These include when there is a possibility of harm to the officers or occupants of the premises, *Commonwealth v. Samuels*, 235 Pa.Super. 192, 340 A.2d 880 (1975), *Commonwealth v. McKeever*, 229 Pa.Super. 35, 323 A.2d 44 (1974); where unusual activity leads to a reasonable belief that evidence is being destroyed, *Commonwealth v. Harper*, 233 Pa.Super. 294, 334 A.2d 761 (1975); *Ker v. State of California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); or where the police have valid grounds for being virtually certain that the persons inside the premises to be searched already know the identity and purpose of the police. In such a case, useless gestures by the police are

unnecessary. *Commonwealth v. Fisher,* 223 Pa.Super. 107, 296 A.2d 848 (1972), *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

*Commonwealth v. Beard,* 282 Pa.Superior Ct. 583, 586–587, 423 A.2d 398, 400 (1980) (Opinion by Montgomery, J.; Dissenting Opinion by Cercone, P.J.).[8]

A second line of cases that holds that "even with a proper announcement [of the police's identity and purpose] an occupant of the premises must be given a reasonable period of time within which to surrender his privacy, absent exigent circumstances." *Commonwealth v. Cerulla,* 223 Pa.Superior Ct. 24, 296 A.2d 858 (1972). In *Commonwealth v. DeMichel,* 442 Pa. 553, 277 A.2d 159 (1971) the Pennsylvania Supreme Court held that a lapse of ten to fifteen seconds between the time the police announced their identity and possession of a search warrant, and their unconsented entry (forcible) into the suspect's home was not long enough to meet constitutional muster. The Supreme Court reached a similar conclusion in *Commonwealth v. Newman, supra.* In *Common-*

---

**8.** Speaking for the Court in *Commonwealth v. Beard, supra,* Judge Montgomery cogently stated:

[P]rior to making a forcible entry, the officer must, absent exigent circumstances, announce his identity and purpose to provide the occupant with a reasonable opportunity to surrender his privacy. *Commonwealth v. DeMichel,* 442 Pa. 553, 277 A.2d 159 (1971), *Commonwealth v. Easton,* 231 Pa.Super. 398, 332 A.2d 448 (1975). "The purpose of this announcement rule is that '...the dignity and privacy protected by the fourth amendment demand a certain propriety on the part of policemen even after they have been authorized to invade an individual's privacy.'" *Commonwealth v. DeMichel, supra,* 442 Pa. 561, 277 A.2d at 163, quoting *United States ex rel. Ametrane v. Gable,* 276 F.Supp. 555, 559 (E.D.Pa.1967) aff'd, *United States ex rel. Ametrane v. Gable,* 401 F.2d 765 (3rd Cir. 1968).

This announcement requirement not only reflects the undiluted respect in which we hold an individual's right to privacy, but it also serves to reduce the potential for violent confrontations between officers and occupants and to guard against needless destruction of private property. *Commonwealth v. Duncan,* 485 Pa. 340, 402 A.2d 662 (1979). *Commonwealth v. Perry,* 254 Pa.Super. 549, 386 A.2d 86 (1978); *United States v. Bustamante-Gamez,* 488 F.2d 4 (9th Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1973).

Id., 282 Pa.Super. at 586, 423 A.2d at 400.

*wealth v. Riccardi*, 220 Pa.Superior Ct. 72, 283 A.2d 719 (1971) this Court held that where the police had tricked the suspect into opening his door and then forced their way in when he saw them and tried to close it, and where they did so without properly announcing themselves, then the search made pursuant to the warrant they carried was illegal and the evidence should have been suppressed. In deciding *Riccardi* we relied on *Commonwealth v. DeMichel, supra* and *United States ex rel. Ametrane v. Gable*, 276 F.Supp. 555 (E.D.Pa.1967) aff'd, 401 F.2d 765 (3rd Cir. 1968), wherein it was held that a person must be given a reasonable opportunity to surrender his privacy voluntarily.

■ Admittedly, the cases cited here concern the execution of search warrants, but we see no reason to differentiate between one type of official intrusion and another: they differ only in degree not in kind. As Justice Stevens stated, writing for a majority of the Court in *Payton v. New York*:

> ... [T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their...houses...shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own house and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 5 L.Ed.2d 734, 81 S.Ct. 679, 97 A.L.R.2d 1277. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.

*Id.*, 445 U.S. 573, 589–590, 100 S.Ct. 1371, 1381–1382, 63 L.Ed.2d 639, 652–653. Clearly there is no reasonable basis

for distinguishing police conduct permissible when effectuating an arrest without a warrant from that which is permissible when a warranted arrest is made, except where exigent circumstances adhere. It would be anomalous to require the police to observe certain proprieties when executing an arrest warrant but allow them to skirt those requirements simply by effectuating the arrest without a warrant. Thus, it can be said that, in the absence of exigent circumstances, the police must always announce their presence and purpose, and wait a reasonable time to allow a voluntary response to the knock. Absent exigent circumstances, a fifteen second delay between the police's announcement of their identity and intention to arrest a person in his home (with or without a warrant) and their entry into the home without consent is no less unconstitutional an intrusion than one where the police's intention is to search the premises.

■ Instantly, it becomes clear that unless there were exigent circumstances permitting the official intrusion the police's entry was illegal, coming as it did within less than half a minute of the announcement of their intention to arrest Hogle, where that announcement was made to one who did not consent to the entry and who was not the suspect the police were seeking. It would follow therefrom that if the entry had been illegal, then the officers' observation of the marijuana in the living room was fruit from the poisonous tree, and thus would invalidate the search warrant and require the suppression of all the physical evidence. We proceed now to determine whether there were such exigent circumstances as to permit this otherwise impermissible intrusion into appellants' privacy.[9]

### Exigent Circumstances

■ The reasonableness of searches and seizures must necessarily be determined on a case-by-case basis because of

---

**9.** As residents of the farmhouse, it is clear that all three appellants had legitimate expectations of privacy which could have been violated by an improper entry and thus have proper standing to raise the issue. *See United States v. Salvucci, supra; Commonwealth v. Sell, supra.*

the myriad factual settings which face the police as they attempt to preserve the peace and ferret out crime. As Judge Leventhal wrote in *Dorman v. United States* :

Terms like "exigent circumstances" or "urgent need" are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant, and that it is only in the light of those circumstances and that need that the warrantless search meets the ultimate test of avoiding condemnation under the Fourth Amendment as "unreasonable."

Id., 435 F.2d at 392. The *Dorman* court, recognizing that the "numerous and varied street fact situations" do not allow for the development of single test by which to measure the reasonableness of warrantless arrests, went on to enumerate several factors which have been judged important in making such determinations. Among the factors the *Dorman* court considered were: (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is a strong reason to believe that the suspect is within the premises being entered, (5) whether there is likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, (7) and the time the entry was made. *See Dorman v. United States, supra, Cf. Commonwealth v. Williams, supra; Commonwealth v. Wagner, supra.* This "checklist" approach, although fairly widely accepted,[10] has been criticized as being too inflexible and disconsonant with the needs of the police officer in the street.[11] Other courts have adopted

10. See e.g. *Commonwealth v. Williams, supra.* And see, e.g., *United States v. Campbell,* 581 F.2d 22 (2d Cir. 1978); *United States v. Reed,* 572 F.2d 412 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *Salvador v. United States,* 505 F.2d 1348 (8th Cir. 1974); *United States v. Shye,* 492 F.2d 886 (6th Cir. 1974); *Vance v. North Carolina,* 432 F.2d 984 (4th Cir. 1970).

11. *See,* LaFave, *"Case-by-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma,* 1974 Sup.Ct.Rev. 127, 141, where he says:

a "totality of the circumstances" test. *See e.g., United States v. Flickinger,* 573 F.2d 1349 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1976). This test has also been criticized, however, not for its inflexibility but for its lack of certainty and direction to the police officer.[12]

We recognize that the courts in *Dorman* and *Flickinger* were considering the exigencies which might permit warrantless home arrests, and thus are not strictly applicable to this case where the question is not the lack of a warrant but the method of effectuating the arrest. Here we are concerned with a legal setting akin to the cases concerning the

> Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, and, and buts or requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges feed, but they may be literally impossible of application by the officer in the field.

**12.** *See* Harbaugh & Faust, *"Knock on Any Door"—Home Arrests after Payton and Steagald,* 86 Dick.L.Rev. 191, 225 (1982).

Harbaugh and Faust have proposed a test, which they claim will preserve the flexibility of the "totality of the circumstances" test and the definitiveness of the *Dorman* "checklist." It reads:

> When a law enforcement officer has probable cause to believe a person has committed a crime classified as a felony and has probable cause to believe that person is in his home or the home of another person, the officer may effectuate an arrest of that person without procuring an arrest warrant for that person or a search warrant for the home if, upon learning of facts sufficient to form a probable cause belief that the person is in his home or the home of another, the officer (a) has probable cause to believe that a delay to procure an appropriate warrant will gravely endanger the officer or another person, or result in the destruction or removal of evidence, or the escape of the suspected felon, and (b) enters or attempts to enter the home where the person is believed to be in a reasonable manner within the time it would have taken him to procure an appropriate warrant under the then existing circumstances.

*Id.* at 226 (Footnote omitted).

We are ourselves reluctant to characterize the factors enumerated in *Dorman v. United States* as a *checklist.* The seven factors set out by Judge Leventhal were specifically stated to be relevant to the *Dorman* factual setting. Thus, *Dorman* itself differs little in approach from the so-called "totality of the circumstances" standard adopted by the Ninth Circuit in *United States v. Flickinger, supra.*

knock and announce rule, its requirements and accompanying restrictions on police action, and the exigencies permitting its waiver. Nevertheless, we find the analysis in those cases instructive and shall rely on them to determine whether there were exigent circumstances present here permitting a waiver of the knock and announce rule. This is not to say that we will ignore the factors normally considered in knock and announce cases. Roughly those same factors were considered in *Flickinger* as relevant to warrantless home arrests.[13]

The lower court considered the *Dorman* exigent circumstances test for the first time on post-verdict motions. It concluded that of the seven factors enumerated in *Dorman* all but one pointed to a finding that exigent circumstances were present in the case. Our analysis leads us to a different conclusion entirely.

The first factor to be considered under *Dorman* is the gravity of the offense. The crime for which the police had probable cause to arrest Hogle was a felony: unlawful delivery of controlled substances. This was not a violent crime, and that alone weighs heavily against the police's entry in this case. Moreover, the crime was committed nearly four months before the police sought to arrest Hogle. Clearly, the police themselves did not believe the crime was grave enough to warrant swift arrest when it was first committed. A few more seconds would not have undone an arrest which had waited four months. The second factor, whether or not Hogle was believed to be armed, was decided by the lower court to weigh against the entry, and we find that we are in accord with that decision. As to the third factor, it is clear that the officers had more than probable cause to arrest Hogle since they sought to charge him with a

---

**13.** We have already enumerated the factors generally held relevant to knock and announce cases, *infra*. Among them are: possibility of harm to occupants of the premises, or to police officers; the possible destruction of evidence relevant to proving the crime of which the object of the search is suspected. To this list, the court in *Flickinger* added the possibility of flight by the suspect (a factor not relevant to evidence, although logically analogous to the destruction of evidence).

felony committed in the presence of one of their number. The fourth factor also favors the entry—the arresting officers knew their suspect was present in the house because they had seen him through a window. The fifth factor, the likelihood of the suspect's escape if his capture were not quickly accomplished, is entirely lacking. Hogle did not know that he was wanted. Even if his mother had told him about Officer Bilansky's visit to the house in Chambersburg, she could not have known that Bilansky was a police officer or that he had been there to arrest Hogle, since he had come undercover. Furthermore, the crime for which he was wanted had occurred some months before and Hogle had not left the jurisdiction. There was no reason to believe that he would suddenly flee. Of course, once the police had arrived at the scene it would have been reasonable for them to believe that Hogle might have tried to avoid the arrest. This eventuality was covered by the stationing of additional officers outside the various avenues of potential escape. Having covered Hogle's possible escape routes, and without indication that he was trying to flee, there was little reason to rush the house to prevent his escape.[14] As for the sixth

14. To conclude otherwise would be to permit unreasonable entries in myriad cases, since there is almost always a potential for escape once the police have begun an arrest. *Cf. Commonwealth v. Beard,* 282 Pa. Superior Ct. 583, 423 A.2d 398 (1980). This Court held there (with this writer dissenting) that evidence was properly suppressed where the police's method of executing a search warrant was a clear attempt to skirt the knock and announce rule by precipitating exigent circumstances permitting them to enter a dwelling forcibly.

The instant case does not fall four-square with *Beard.* In *Beard* the police created the exigent circumstances by virtue of their method of executing the warrant. In *Beard* there was reason to believe that evidence was being destroyed—the exigent circumstance which would normally have permitted the entry—and that appellants' actions were precipitated by the police.

In this case there was neither evidence nor reason to believe that Hogle was trying to escape when the police entered the house. Although I expressed misgivings in my dissent to *Beard, id.,* 282 Pa.Super. at 590–591, 423 A.2d at 402, to the proposition that the police could create the exigent circumstances and thereby cause the ultimate suppression of the evidence, we need not concern ourselves with them here, since here there were no exigent circumstances of the kind found in *Beard.*

factor, the entry was peaceable although accomplished with guns drawn; no one was injured, no doors broken, no shots fired. Nonetheless, entry was made without the consent of the residents and thus this factor cannot be said to weigh entirely in the Commonwealth's favor. Finally, the entry to make the arrest was made in the early evening, and although it was dark it was too early to have aroused the house's residents from their beds.

Factors three, four, and seven weigh in on the Commonwealth's side of the balance. On the other side of the scale we find factors two and five. The remaining factors, one and six, tip neither way. Applying a balancing test,[15] we find that the fact that the crime for which Hogle was being arrested was several months old, that he was not a fugitive, and that there were no indications of an attempt to flee arrest, as well as the fact that the police did not suspect him of being armed outweigh the other factors, and show that under this analysis no exigent circumstances were present.

We turn now to the "totality of the circumstances" test, as it may be relevant to the knock and announce rule. As with the *Dorman* test, the possibility of the suspect's flight is a relevant factor under this test. As we have seen, there was little likelihood of Hogle's flight, and what chance there was had been provided for. Nor was there any indication that he attempted to flee. We have seen that the police did not suspect Hogle was armed, accordingly, there was little reason to expect harm either to the occupants of the house or to police personnel. Neither did the police have reason to fear the destruction of evidence pertinent to the crime for which Hogle was sought. When Agent Bilansky purchased

We reserve comment on the propriety of a suppression ruling involving evidence obtained after entry into a dwelling, where there was reason to believe that the suspect was attempting to escape, and where the attempt to escape resulted from the police's action in seeking to effectuate an arrest, until that case is properly prosecuted.

**15.** *Commonwealth v. Wagner, supra; Commonwealth v. Pytak,* 278 Pa.Superior Ct. 476, 420 A.2d 640 (1980); *Commonwealth v. Fladger,* 263 Pa.Superior Ct. 538, 398 A.2d 707 (1979).

the drugs from Hogle in July of 1977 the police had all the evidence they would have needed to insure Hogle's conviction. Moreover, since the police had not secured a search warrant prior to the entry of the house, it is reasonable to conclude that they had no reason to believe that there were large quantities of illicit drugs present, and thus no reason to fear their destruction.[16] Furthermore, there was no need for immediate police action otherwise demonstrated. The totality of the circumstances thus point away from a finding of exigent circumstances permitting a waiver of the knock and announce rule.

■ Having found no exigency which would permit the waiver of the knock and announce requirement of the Fourth Amendment we are forced to decide the reasonableness of the police's entry into the appellants' household within twenty seconds of their arrival and announcement of their identity and purpose. In light of the holdings in *Commonwealth v. DeMichel, supra, Commonwealth v. Newman, supra* and that line of cases, we are constrained to conclude that the entry into appellants' household was precipitous and hence illegal.

Because the entry was unreasonably effectuated, all the evidence garnered as a result ought to have been suppressed. See *Wong Sun v. United States, supra.* Clearly, the lower court erred when it refused appellants' suppression and post-trial motions. Accordingly, we reverse their convictions and remand the case for appropriate disposition below.

Reversed and remanded.

WATKINS, J., dissents.

**16.** In the absence of a search warrant, we must presume the police had no probable cause to search for drugs, since to conclude otherwise would be tantamount to finding that the police intended to violate the Fourth Amendment rights of the appellants. We are loathe to arrive at such a conclusion in absence of substantiating evidence.