469 A.2d 644

**COMMONWEALTH of Pennsylvania**

v.

**Herbert TUCK, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 14, 1983.

Filed Nov. 25, 1983.

Petition for Allowance of Appeal Denied Feb. 9, 1984.

Bonnie B. Leadbetter, Philadelphia, for appellant.

Robert B. Lawler, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before CAVANAUGH, MONTEMURO and HESTER, J.

HESTER, Judge:

In a non-jury trial, Herbert Tuck, appellant, was found guilty of voluntary manslaughter. Appellant's conviction stemmed from an incident in which he shot and killed his concubine, Deborah Humphrey, at Latona Street in Philadelphia on April 24, 1980. Post-verdict motions were denied and appellant was sentenced to not less than five years nor more than ten years.[1] Appellant then filed this appeal.

1. Appellant's post-verdict counsel (present counsel) filed a notice of appeal on December 7, 1981, listing the appeal as being from Bill No. 1322, May Term, 1980, voluntary manslaughter. Appellant was also convicted on the charge of possession of an instrument of crime, Bill No. 1324 and sentenced to not less than two and one-half years nor more than five years, this sentence to run concurrent with the voluntary manslaughter sentence. This latter Bill No. 1324, instrument of crime, was not listed on appellant's notice of appeal. Post-verdict counsel filed a petition to amend the notice of appeal in April, 1983, to include Bill No. 1324. By an order entered May 17, 1983, the Superior Court granted the petition but reserved, without prejudice, the Commonwealth's right to argue the jurisdictional propriety of the amendment at argument or in its brief. In its brief, the Commonwealth contends that since appellant's petition to amend his notice of appeal was some 16 months after the original filing, the time for filing a proper notice of appeal has passed. We are compelled to agree. *See Commonwealth v. Keys,* 313 Pa.Super. 410, 460 A.2d 253 (1983), and therefore quash the appeal from Bill No. 1324, instrument of crime. However, we emphasize that the arguments raised in appellant's brief are equally directed and applicable to each of the two separate charges. In addressing and considering appellant's argument with respect to the voluntary manslaughter charge, we, in effect, will have addressed and considered the same grounds raised challenging the instrument of crime charge. In light of the evidence in this case and the concurrent running of the sentences imposed, we see no

The first assignment of error is the trial court's admission of two written custodial statements given by appellant to the police shortly following his arrest. Specifically, appellant argues that the suppression court erred in denying the motion to suppress the statements because appellant's emotional and mental state at the pertinent time precluded a knowing and voluntary waiver of his Fifth and Sixth Amendment rights required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■■■ Our scope of review of the denial of a motion to suppress is well-established. The suppression court must make findings of fact and conclusions of law in determining whether the evidence obtained was in derogation of the defendant's rights. On appeal we must determine whether the record supports the factual findings of the suppression court, as well as determine the reasonableness of any inferences and legal conclusions drawn from the court's findings. *Commonwealth v. Eliff*, 300 Pa.Super. 423, 446 A.2d 927 (1982). In determining whether the record supports the court's findings of fact, we are restricted to reviewing the evidence presented by the Commonwealth and so much of the evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Eliff*, supra.

■■ The suppression court found these facts: Following the shooting death of Deborah Humphrey on April 24, 1980, appellant was taken into police custody at approximately 5:30 p.m. and transported in a police squad car to the homicide division. Appellant was accompanied by his sister, and neither he nor his sister was handcuffed. Tuck and his sister arrived at homicide headquarters at approximately 6:00 p.m. At approximately 6:30 p.m., appellant met with Detective English in an open area of the homicide division. English advised appellant he was going to be questioned about the shooting and gave him the requisite *Miranda* warnings. Appellant indicated a waiver of his *Miranda*

prejudice suffered by appellant due to the failure to file a timely petition to amend his notice of appeal.

rights and expressed his willingness to give a statement. Appellant gave a statement which lasted until approximately 8:30 p.m.[2] During the course of the interview with English, appellant was alert and attentive. He did, however, frequently interrupt the interview by jumping up and exclaiming, "... tell me Debbie isn't dead." After each such interruption, appellant regained his composure and continued with the interview. Following the interview, appellant requested a drink of water and the opportunity to use the bathroom. English honored appellant's request. At approximately 8:40 p.m., appellant requested to make a telephone call to his family. Upon the granting of this request, appellant engaged in a twenty minute telephone conversation. At 9:00 p.m., appellant asked English if he could speak with his sister. English permitted appellant to privately talk with her in an interview room. During their conversation period which lasted approximately thirty minutes, English learned that a search of the crime scene had produced a gun found in the bathroom. At about 9:35 p.m., English led appellant into an interrogation room, advised him of the discovery of the gun and rewarned him of his *Miranda* rights. Appellant again indicated a waiver of his Fifth and Sixth Amendment rights and expressed his willingness to give a statement.[3] During this second interview

**2.** Appellant's statement was directly recorded on the typewriter. It is exculpatory in nature and stated, in part, that he and the deceased victim had lived together for about five years, that they argued frequently, that prior to the shooting they had been arguing, that he left their house after their argument, that he later returned and found her lying on the floor in the upstairs bedroom and that he carried her body from the upstairs bedroom to the hallway on the second floor.

**3.** Appellant's second statement was directly recorded on the typewriter as a continuation of the first interview. It is inculpatory in nature and is as follows:

Q. Herbert I want to inform you that a gun has been found in the bathroom on the second floor of your home will you tell me what you know about this, will you now tell me the truth as to what happened to Debbie?

A. I was in the bedroom after I had the argument with Debbie and she came into the bedroom. I had this gun in my hand and I was playing with the clip putting it into the gun and Debbie said to me to put the gun away. Then she pushed the bed and the bed broke

which lasted until 10:20 p.m., appellant walked about agitatedly, interrupted the questioning with several emotional outbursts, cried, and again exclaimed, "... please tell me Debbie isn't dead." After each such interruption, Tuck regained his composure and continued with the interview. We find ample evidence in the record to support the suppression court's findings of fact.

Turning now to the suppression court's conclusion of law challenged in this appeal; it found appellant's two statements to have been given following an intelligent and voluntary waiver of his *Miranda* rights. This conclusion is fully supported by the following facts: though testimony by the officers at the crime scene described appellant's emotional state as "hysterical", the record nevertheless establishes that his sensorium was not impaired.[4] At the crime scene, appellant exhibited no problem communicating with the officers present. He understood and followed their various instructions and voluntarily accompanied them to homicide headquarters. Before leaving the crime scene, appellant asked for his nerve medication, thus exhibiting

the mirror. I hollered and screamed at her, I placed the gun on top of a bannister in the hallway. Then we were pushing and shoving and she was biting my finger and I pulled away from her and I pulled the gun off of the bannister and it went off. She laid down and I called my Mother.

Q. Was the gun cocked?
A. No.
Q. Whose gun is it, where did it come from, who brought it into the house?
A. [...] gave it to me for protection, he gave it to me a couple of weeks ago and I left it in the house.
Q. Where was Debbie when the gun went off? Where were you?
A. We both were in the hallway.
Q. Herbert is this the truth?
A. Yes, sir.
Q. Is there anything else that you want to add to this?
A. No.
Q. Was anyone else in the bedroom when you and Debbie were arguing and when the gun went off?
A. No.
Q. Herbert you will read this and if it is what you say to be the truth will you sign this to show that you have read it?
A. Yes.

4. Sensorium is an individual's ability to speak, hear and think clearly.

the presence of mind to care for his own physical well-being. During the ride to headquarters, despite being visibly upset, he repeatedly asked whether the victim was alive or dead.

At headquarters, appellant was informed by English that he was to be questioned about the Deborah Humphrey shooting. English read appellant his *Miranda* rights from a standard form 75–Misc.–3, Police Interrogation Card. Appellant verbally answered the seven comprehensive *Miranda* questions appearing on the reverse side of the form. Appellant's responses, which were typewritten onto the interview sheet and initiated by appellant, established a knowing and voluntary waiver. Appellant then gave his first statement, a lengthy *exculpatory* statement to detective English which contained coherent and responsive information. Though appellant interrupted the interview at different times by exclaiming "... tell me Debbie isn't dead", he regained his composure and continued with the interview. English testified that appellant demonstrated a willingness to talk about the incident, was alert, and responsive.

Following the first interview, appellant requested to satisfy his biological needs and was permitted to do so. Subsequently, he requested to phone his family. This request was honored and he engaged in a normal telephone conversation with a family member for approximately twenty minutes. He also requested to speak privately with his sister and did so for about one-half hour. Prior to giving his second statement, appellant again was given his *Miranda* rights. In response to English's request, appellant supplied answers to the comprehensive questions appearing in the standard police form sheet and his responses were hand-recorded in the appropriate spaces. The sheet was handed to appellant who read, initialed each of the recorded answers and signed the bottom of the sheet. Appellant's responses established a voluntary waiver of his *Miranda* rights. Appellant gave a second statement to English which *contradicted* his exculpatory first statement. It

336

contained coherent and responsive information. English then presented the four-page interview sheet which contained both statements to appellant and requested him to read and sign it if its contents were accurate. Appellant read each page and signed his name at the bottom of each page.

Despite appellant's periodic outbursts during the time he gave the statements, we are convinced that appellant possessed sufficient sensorium to freely and voluntarily waive his constitutional rights. The mere fact appellant was excited and emotional following the shooting death of his girlfriend does not compel us to conclude that appellant did not know what he was doing; quite the contrary, since the record establishes that he was alert, rational, responsive and sufficiently composed to enable him to validly waive his constitutional rights prior to making the statements. Appellant understood the nature of the questioning, was advised on two occasions of his *Miranda* rights prior to giving the statements and responded in a manner indicating a waiver of them. See, *Commonwealth v. O'Bryant*, 479 Pa. 534, 388 A.2d 1059 (1978), cert. denied, 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978). Accordingly, we affirm the suppression court's denial of the motion to suppress since its determination that appellant intelligently and voluntarily waived his *Miranda* rights is amply supported by the record.[5]

The second assignment of error is an ineffectiveness challenge to the representation provided appellant by his

5. We note that findings of a suppression court relating to the mental competency of a defendant to waive his *Miranda* rights, if supported by the evidence, have been affirmed despite the presence of purported disabilities more serious then those alleged here. *Commonwealth v. Cornish*, 471 Pa. 256, 370 A.2d 291 (1977) (drug withdrawal); *Commonwealth v. Crosby*, 464 Pa. 337, 346 A.2d 768 (1975) (low I.Q. and limited education); *Commonwealth v. Cannon*, 453 Pa. 389, 309 A.2d 384 (1973) (paranoid schizophrenic); *Commonwealth v. McQuaid*, 273 Pa.Super. 600, 417 A.2d 1210 (1980) (serious illness during hospitalization).

court-appointed trial counsel, Donald G. Joel, Esquire.[6]  The gravaman of appellant's claim is not that trial counsel's representation lacked any "reasonable basis designed to effectuate his client's interest," *see Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Instead, post-verdict counsel alleges that appellant was deprived of his Sixth Amendment right to counsel because of a "complete breakdown of communication" between appellant and trial counsel (Post Trial Hearing, N.T. 3–7, 45). Specifically, appellant alleges that the trial court erred in refusing to allow Joel to withdraw when he requested to do so at the guilty plea colloquy.

A survey of the record reveals the following.  After the suppression court's ruling on appellant's pre-trial motion to suppress, the case proceeded to jury selection.  Following selection of the jury but before formal commencement of trial, appellant advised Joel that he wished to enter a guilty plea.  Joel conferred with appellant and advised him against tendering the plea.  Despite Joel's advice, appellant chose to tender the plea.  A guilty plea colloqy was conducted over a two-day period.  Our perusal of this portion of the transcribed record indicates that Joel and appellant communicated without any indication of either hostility, mistrust or irreconcilable differences.  In fact, appellant repeatedly expressed his satisfaction with Joel's representation.

During his testimony at the colloquy, appellant stated that the deceased victim had been accidently shot when he attempted to wrestle the gun from her hand.  Because of this testimony, the trial judge ordered appellant's plea to be withdrawn and announced that the case would proceed to trial.  At this point, Joel conferred with appellant and then requested the court to grant him leave to withdraw.  Joel stated on the record that he did not want to further represent appellant, that he was having difficulty communicating with him and that he wanted to withdraw as counsel.  Joel's

6.  Appellant's court-appointed trial counsel, Donald G. Joel, withdrew with leave of court at the post-verdict stage.  Consequently, this claim is advanced by new post-verdict counsel.

motion to withdraw was denied and as a consequence, Joel represented appellant in a bench trial.

At a post-trial evidentiary hearing before the lower court, Joel explained the actual facts and circumstances which preceded his motion to withdraw and his motives for the motion. Joel testified that appellant became emotional, fearful and confused after hearing the court order the withdrawal of the guilty plea. It was at this particular point in time, when appellant became upset, that Joel was unable to communicate to him (Post-trial Hearing, Oct. 14, 1981, N.T. 22-3, 37). Joel's testimony at the evidentiary hearing also revealed his self-serving reasons for making the motion to withdraw.[7]

■ While we in no way condone the actions or self-serving attitude of trial counsel, we do not conclude that trial counsel's actions or attitude caused appellant to be without effective representation.

Our study of the record belies appellant's assertion that a communication problem between him and Joel rendered Joel's representation constitutionally inadequate. At no time during the proceedings below did appellant express that he disliked his attorney, that he distrusted him, that he was dissatisfied with counsel's strategies or that he and his attorney had any disagreement. In fact, Joel permitted appellant to attempt to tender a guilty plea though he did not agree with the strategy. During the bench trial which commenced *only* two days after the motion to withdraw was made, appellant did not display a lack of confidence toward Joel or complain about the representation he was receiving. The record also demonstrates full and effective communication between appellant and Joel at trial. At

7. Joel testified that he did not like appellant, that he did not wish to spend anymore time on the case, that he did not desire to justify his representation in a later collateral proceeding, that he experienced frustration due to his momentary inability to communicate with appellant, that he was surprised at appellant's testimonial version which described the cause of death as accidental and that the two-day guilty plea colloquy had resulted in a waste of time and energy. (Post trial hearing, October 14, 1981, N.T. pp. 14-44).

trial, appellant chose not to testify on his own behalf only after a full discussion with Joel. We note further that the momentary breakdown of communication between appellant and Joel at the guilty plea colloquy had no bearing on the defense ultimately presented at trial. In fact, appellant admits that trial counsel was well-prepared and competent.

Of course, irreconcilable differences between an attorney and his client or a complete breakdown of communication between them could result in the denial of a defendant's right to competent representation. *See, Commonwealth v. Tyler*, 468 Pa. 193, 360 A.2d 617 (1976) (court appointed counsel and defendant agreed that an irreconcilable difference existed as to the manner in which the trial should be conducted). However, we do not consider a momentary breakdown in communication between appellant and Joel supportive of such a conclusion in this case. See, *Commonwealth v. Kittrell*, 285 Pa.Super. 464, 427 A.2d 1380 (1981); *Commonwealth v. Olivencia*, 265 Pa.Super. 439, 402 A.2d 519 (1979). See generally, *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (Sixth Amendment right to counsel does not include right to a meaningful attorney-client relationship and therefore found no abuse of discretion in the denial of defendant's request for a continuance where defendant's attorney was fully prepared and ready for trial). In fact, the record establishes the absence of any evidence to support a conclusion that either hostility, irreconcilable differences or communication difficulties between appellant and Joel prevented effective representation.

The grant or denial of court-appointed trial counsel's petition to withdraw is within the sound discretion of the trial court, see *Commonwealth v. Segers*, 460 Pa. 149, 331 A.2d 462 (1975), and as such, should not be overturned unless we find an abuse of discretion. Based on the foregoing, we find no abuse of discretion in the trial court's denial of trial counsel's motion to withdraw.

Judgment of sentence affirmed.